IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| COLUMBIA GRAIN, INC., a Corporation,<br><br>      Plaintiff,<br><br>      v.<br><br>HINRICHS TRADING, LLC, dba HINRICHS TRADING COMPANY; HINRICHS AND COMPANY, a general partnership; and JOHN DOES I-V,<br><br>      Defendants. | Case No.  3:14-CV-115-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

The Court has before it a motion for summary judgment filed by defendant Hinrichs Trading Company.  The motion originally sought, in part, the dismissal of defendant Hinrichs and Company, but the parties later stipulated to that dismissal and the Court approved, dismissing that defendant.  The Court heard oral argument on the motion on March 26, 2015, and denied the motion from the bench.  This written opinion provides a more detailed explanation for the Court's ruling.

## BACKGROUND

On Sunday, May 12, 2013, a fire started in the wood crib grain elevator leased to defendant Hinrichs Trading Company and used to store garbanzo beans.  The fire spread to and destroyed a nearby elevator owned by plaintiff Columbia Grain, resulting in $4.3

million in damages to Columbia. In this litigation, Columbia seeks to recover those losses from Hinrichs.

Columbia claims that the fire in the Hinrichs' elevator resulted from an overheated bearing that set fire to garbanzo bean dust that had accumulated in the top room of the elevator, known as the head house. Columbia asserts that Hinrichs' personnel ignored warning signs, and failed to keep the bearings properly greased and the head house properly cleaned.

The elevator is basically a tower. A bucket elevator scoops up the grain or beans at the lower level and lifts them to a distributor or sorter that conveys the material to the proper bin or silo. This apparatus has metal bearings that periodically must be lubricated due to the constant friction while the elevator is operating.

The last work done in the Hinrichs' elevator was on Friday May 10th, two days before the fire. On that day, Hinrichs' maintenance manager Gary Henderson was working with employees Brad Hobson and Jeff Pontious, and they ran the elevator most of the day, leaving at roughly 4:00 p.m. They testified that they turned off all the equipment, and their testimony is confirmed by the power company records. About two days later, on Sunday, smoke was seen coming from the Hinrichs' elevator, and then flames. The fire quickly spread to the nearby Columbia elevator. Both were a total loss.

Hinrichs has filed a motion for summary judgment, arguing that no evidence supports Columbia's theory about how the fire started. Columbia responds that the record contains evidence that creates questions of fact on the origin of the fire, precluding summary judgment.

**ANALYSIS**

Hinrichs' motion hinges entirely on excluding the opinions of Columbia's expert, Michael Fitz about the origins of the fire. If Fitz's opinions stand, there are clearly sufficient questions of fact to preclude summary judgment. Accordingly, the Court will focus exclusively on Fitz's opinion.

Fitz has long experience and extensive education in the study of fires. In this motion, Hinrichs does not challenge his credentials or qualifications to testify about the origins of this fire, but rather challenges the reliability of his opinions.

Based on his study of the evidence in this case, Fitz concluded "that this fire started in the upper level of the head house from an overheated bearing on Friday afternoon, ignited garbanzo dust and wood members, smoldered for two days and then grew into a large fire during the high winds on Sunday afternoon." *See Fitz Affidavit (Dkt. No. 38-1)* at ¶ 18. Hinrichs argues that Fitz's opinion is pure speculation without factual support. The Court will examine the record concerning each aspect of Fitz's opinion to determine if that opinion is based on evidence or speculation.

**Ignition Source**

To support his conclusion that the ignition source was an overheated bearing, Fitz relies in part on the testimony of two men who lived next to the Hinrichs' facility, Terry McIlvain and Mike Weedle. McIlvain described a loud sound like "metal scraping on metal" that "was unmistakably coming [from] the head house of the Hinrichs' elevator." *See McIlvain Deposition (Dkt. No. 31-25)* at pp. 13-14. Weedle, who was in the heating and cooling business and had experience with failed bearings, testified that he heard a

sound of "a bearing going out" and that it came "out of the head house." *See Weedle Deposition (Dkt. No. 31-24)* at p. 15, 19. He heard that sound on the Friday before the fire. *Id.* at p. 16.

Fitz also relies on the testimony of Scott Keifer, Columbia's maintenance supervisor who has experience with failed bearings. Kiefer testified that on the Friday before the fire, he noticed that when the Hinrichs' elevator was running, it emitted a noise consistent with "a worn-out bearing." *See Kiefer Deposition (Dkt. No. 31-26)* at p. 16. Further support comes from Hinrichs' own employees, Brad Hobson and Jeff Pontious. Both testified that as they worked with the elevator on the Friday before the fire, they noticed a "warm smell" or a "warm, hot rubber smell" coming from the elevator legs. *See Hobson Deposition (Dkt. No. 34-36).* They were concerned enough that they shut down the legs and took off the covers to see if they could determine where the smell was coming from. *Id.* They had no success.

There is also evidence that Hinrichs' personnel were using food-grade grease to lubricate the bearings, and that this type of grease would need to be replaced every two or three weeks, s*ee Trombetta Deposition (Dkt. No. 31-14)* at p. 14, as opposed to every six months with the type of grease used by the prior owner. *See Henderson Deposition (Dkt. No. 38-3)* at p. 38; *Coursey Deposition (Dkt. No. 38-3)* at p. 13. John Marshall, who greased the bearings, testified that the food-grade grease seemed "to break down a lot faster." *See marshall Deposition (Dkt. No. 31-15)* at p. 17.

There is some question whether this more frequent maintenance on the bearings – which were located in the head house – was being performed. The person responsible,

Gary Henderson, testified that "I don't like to go up there." *See Henderson Deposition (Dkt. No. 38-3)* at p. 120. When Coursey was training Henderson, he told Henderson to "go upstairs and look around just to see what everything looked like." Coursey testified that Henderson "went up about six feet and came down and said he's too scared to go upstairs." *See Coursey Deposition (Dkt. No. 38-3)* at p. 19. Henderson's fellow employee, Norman Trombetta, testified that Henderson was afraid of heights. *See Trombetta Deposition, supra,* at p. 18. Two other employees – John Marshall and Norman Trombetta – who did grease the head house bearings, left the company months before the fire, as will be discussed further below. There is thus a serious question as to whether the bearings were being properly lubricated by Henderson.

All of this evidence shows that Fitz's opinion about the ignition source being a failed bearing is not complete speculation – it has a basis in the evidence. Nevertheless, Hinrichs argues, there is substantial evidence to the contrary. For example, when Hobson and Pontious were investigating the smell, Hobson thinks he might have gone up to the head house "checking for the odor" but "[c]ouldn't smell anything." *See Hobson Deposition (Dkt. No. 31-17)* at p. 38. When they restarted the elevator, they ran it for some time without again smelling anything. *Id.* at p. 37. Hinrichs also points out that no failed bearings survived the fire, and argues from this that Fitz has no physical evidence to back up his claim of a failed bearing. Even Fitz admits, Hinrichs argues, that other equipment in the facility could have caused the metal-on-metal grinding noise that Weedle and McIlvain heard.

While this and other evidence contradicts Fitz's opinion on the ignition source, it is not so overwhelming as to render that opinion excludable. The Supreme Court has stated that "[t]rained experts commonly extrapolate from existing data." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). The testimony is excludable when it is "connected to existing data only by the ipse dixit of the expert," and there is "too great an analytical gap between the data and the opinion preferred." *Id.*

Here, there is more than the "ipse dixit" of Fitz to support his opinion on the ignition source. While there is contrary evidence in the record, there is also substantial supporting evidence. "A factual dispute is best settled by a battle of the experts before the fact finder, not by judicial fiat. Where two credible experts disagree, it is the job of the fact finder, not the trial court, to determine which source is more credible and reliable." *City of Pomona v. SQM North America Corp.,* 750 F.3d 1036, 1049 (9th Cir. 2014). The Court therefore refuses to exclude Fitz's opinion that the heat source was a failed bearing.

**Fuel**

Hinrichs next challenges Fitz's opinion about the fuel that caught fire. Fitz concludes that the fuel source was garbanzo bean dust that smoldered for about two days before bursting into flame.

Fitz's own testing demonstrated that the dust is combustible and would ignite at temperatures that can result from a failed bearing. He further testified that "[i]t's been my experience that a fuel bed can smolder for a long time" before bursting into flame. *See Fitz Deposition (Dkt. No. 45-3)* at p. 112. Dust was a constant concern. The head of

maintenance prior to August of 2011, John Coursey, testified that he would check "upstairs" on a daily basis "to make sure there's no dust . . ." *Coursey Deposition (Dkt. No. 38-3)* at pp.13-14. He further testified "that was the main thing to check, was for dust and stuff." *Id.* at p. 14. He was afraid that a failed bearing could get hot enough to start the dust on fire. *Id.* at p. 33.

Hinrichs challenges Fitz's opinion that the dust smoldered for about 2 days until bursting into flame. Hinrichs points out that under Fitz's own test calculations, this would require roughly 7 feet of dust near the failed bearing, as the smoldering fire would consume roughly 2 inches of dust per hour. *See Fitz Report (Dkt. No. 38-1)* at ¶ 5. Hinrichs argues that there is no direct evidence that such a dust layer existed in the head house.

In this summary judgment proceeding, the Court must grant all inferences to Columbia. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). Fitz's testing showed that the smoldering could occur in a "thin dust layer" that would have to stretch for about 7 feet. *See Fitz Affidavit (Dkt. No. 38-1)* at ¶ 25. As discussed above, Causey testified that dust had to be cleaned daily, inferring that the dust build-up might be substantial if left untended for days or months. And the head house dust may not have been swept up because Henderson, as discussed above, was afraid of going up into the heights of the head house. In the deposition excerpts provided to the Court, there is no account by Henderson that he cleaned the head house. *See e.g. Henderson Deposition (Dkt. No. 38-3)* at pp. 118-20 (Henderson's account of closing the facility on May 10, 2013, that did not include any cleaning in the head house area). It is true that Henderson

testified that each day he "kept everything blown off, motors blown off," but when asked what motors he was referring to, he responded that it was the motors "[b]elow the legs in this pit area . . . ." *Id.* at pp. 44-45. So that testimony about cleaning did not refer to the head house.

One reasonable inference a juror could draw from this testimony regarding Henderson, and the testimony of Causey, is that on May 10, 2013, the head house contained a thin layer of dust spreading out over a 7 foot area. Hinrichs argues, however, that such an inference would be unreasonable because John Marshall and Norman Trombetta cleaned the dust out of the head house on a regular basis. Both men worked under the supervision of Henderson. Marshall testified that his morning routine was to open up the facility and "clean the head house." *See Marshall Deposition (Dkt. No. 45-6)* at p. 32. He would sweep and use the air hose to "get the extra dust down" and clean the "belt section" and "underneath where all the pipers were at and everything." *Id.* at p. 33.

But Marshall testified that his last day at the facility was October 12, 2012. *See Marshall Deposition (Dkt. No. 31-15)* at p. 19. That means that he was not cleaning the head house for about 7 months prior to the fire. So Marshall's testimony does little to rebut the inference about a dust build-up in the head house discussed above.

Trombetta provides no more support for Hinrichs. It is true that Trombetta testified that he swept "everything down" in the head house about two weeks before the fire. *See Trombetta Deposition (Dkt. No. 38-3)* at p. 15. This would put Trombetta's cleaning at about April 26, 2013. However, Trombetta concedes that he is "not for sure on the time," *id.* at p. 14, and his supervisor Henderson testified that Trombetta did not

work at the elevator during the "spring of 2013." *See Henderson Deposition, supra* at p. 68. Indeed, Trombetta's time card shows that the last day he worked was March 14, 2013. S*ee Exhibit G (Dkt. No. 38-3).* Thus, Trombetta did not clean the head house for almost two months before the fire.

A fair inference from this evidence is that months passed without any dust cleaning in the head house.[1] Given Causey's testimony that a daily clean-up of dust was necessary, a reasonable inference is that enough dust built up to provide sufficient fuel for Fitz's "long smolder" theory.

## Oxygen

Fitz testified that after smoldering for two days, the dust ignited into flames "during the high winds on Sunday afternoon." *See Fitz Affidavit, supra* at ¶ 18. He testified that the peak wind on Sunday was "18.4 mph at 12:00 noon." *Id.* at ¶ 25. Hinrichs' expert, Dr. Tara Henriksen, disputes this opinion, pointing out that the wind speed data in the Craigmont area between Friday and Sunday shows that the wind speed and direction on Sunday was similar to that experienced on Friday and Saturday. *See Henriksen Affidavit (Dkt. No. 45-7)* at ¶ 2. She asserts that there was nothing special about Sunday that would support his theory that the wind was not strong enough until that day to ignite the smoldering dust.

---

[1] There is testimony from Hobson that he went up to the head house on May 10th to check the warm smell. But there is no evidence that he did any cleaning of dust while up there. He testified that he just "walking around the sides of the legs, sniffing [and] went back down." *See Hobson Deposition, supra* at p. 38-39.

The wind data shows that on Sunday, the wind was blowing at 3 to 4 mph in the morning, but rose steadily beginning about 10 a.m., and reached 18.4 mph at noon. *See Exhibit C (Dkt. No. 45-11).* It then blew continually between about 13 mph and 19 mph for the next 6 hours. *Id.* In comparison, Saturday was calmer. By noon the wind speed was only 9.2 mph, and for the next six hours the wind speed was mostly below 10 mph, with only one reading at 1:10 p.m. of 16.1 mph. *See Exhibit B (Dkt. No. 45-10).* Friday was calmer still, with almost all readings below 10 mph, and many below 5 mph. *See Exhibit A (Dkt. No. 45-9).*

Neither Dr. Henriksen nor Fitz provided the Court with any in-depth analysis of this wind speed data. On its face, the data seems to show that the winds on Sunday were considerably higher than the winds on Friday or Saturday. This seems to confirm Fitz's theory. At any rate, the data does not conclusively refute his theory, and so the Court refuses to exclude his theory on the basis of the wind data.

**Alternative Explanations**

Hinrichs argues that Fitz failed to consider other causes for the fire. But throughout his report, Fitz does just that. For example, he discounts spontaneous combustion as a cause because Hinrichs was taking precautionary measures, there were no reports of heating or moisture, and the burn marks were not consistent with spontaneous combustion. *See Report (Dkt. No. 38-1)* at pp. 2-3. He also reviewed power company records to see if electrical equipment was being run over the weekend that might have contributed to the fire, but found only a minimal use. *Id.* at p. 2. In his deposition, he was repeatedly asked to explain why other factors could not have caused

the fire, and he repeatedly explained why he discounted those causes. *See e.g., Fitz Deposition (Dkt. No. 45-3)* at p. 83. The Court cannot find that Fitz so ignored alternative causes that his opinion should be excluded.

## Point of Origin

In finding that the fire started in the head house, Fitz relied in part on the testimony of Mike Weedle, a volunteer fire fighter for Craigmont. Upon getting the call of the fire, Weedle looked at the facility and saw smoke coming "out of the top of the head house" and then flames coming from that location. *See Weedle Deposition (Dkt. No. 38-3)* at 49-50. He testified that he did not initially see any smoke or flames in lower levels. *Id.* McIlvain's testimony is consistent with Weedle's. *See McIlvain Deposition, supra,* at p. 19. While Hinrichs argues that there is contrary testimony, Fitz's opinion that the fire started in the head house does find support in the evidence and is not so far-fetched that it must be excluded as a matter of law.

## Conclusion

For all of these reasons, the Court will deny the motion for summary judgment.

## ORDER

In accordance with the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that the motions for summary judgment (docket nos. 30 & 31) are DENIED.[2]

---

[2] These two motions are duplicates that were mistakenly both filed, and so the Court will resolve both the same way.



DATED: March 26, 2015

_____
B. Lynn Winmill
Chief Judge
United States District Court